[No. 8991.   Department Two.   December 3, 1910.]

J. F. EVERETT *et al.*, *Appellants*, v. BENJAMIN S. PASCHALL, *Respondent.*[1]

NUISANCE—WHAT CONSTITUTES—SANITARIUM—"COMFORT."   A tuberculosis sanitarium maintained in a residential section of the city will be enjoined as a nuisance, where the fear and dread of the disease is such that it depreciates the value of adjacent property to an extent· of one-third or one-half, and interferes with the comfortable enjoyment thereof, disturbing the minds, nerves and sleep of the occupants; especially in view of Rem. & Bal. Code, § 8309, defining a nuisance as any act that either annoys or endangers the comfort or repose of others.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered April 25, 1910, upon findings in favor of the defendant, dismissing on the merits an action to enjoin the maintenance of a nuisance.   Reversed.

*Reynolds, Ballinger & Hutson*, for appellants.

*F. J. Carver, Arthur E. Griffin*, and *John Slattery*, for respondent.

CHADWICK, J.—The findings of the trial judge show that plaintiffs are the owners of, and reside upon, lot 14, block 19, Madison Park addition to the city of Seattle, in King county; that their property is of the value of $2,000.   Defendant is the owner of the south half of lots 12 and 13, block 9, upon which a cottage is situated.   An alleyway separates plaintiffs' lot from the fractional lots of the defendant.   On November 29, 1909, defendant opened, and has since maintained in his cottage, a private sanitarium for the treatment and care of persons afflicted with tuberculosis.   The sanitarium has a capacity for accommodating ten patients, and since opening, there have been from four to ten patients under treatment.

[1]Reported in 111 Pac. 879.

The court found, also, that the Madison Park addition
is an established residential portion of the city; that the
danger zone of tuberculosis is about three feet, beyond which
there is no danger of infection or contagion; that pulmonary
tuberculosis is a germ disease, thriving only in warmth and
darkness, and propagating only in living animals; that the
germ is destroyed by exposure to daylight without and suf-
fused light within rooms, in from a few minutes to a few
hours; that the danger can be reduced to a negligible quan-
tity by proper care of the expectorants and disinfection of
the vessels used by the patients, their clothing, and the sur-
roundings; that defendant was conducting his sanitarium
with a due regard for the safety of his patients and the
public; that there was no danger to persons living in the
immediate vicinity; that the sanitarium had been in the past,
and would in all probability continue to be, a great benefit
to the community. After finding that the best results could
be obtained only by locating the sanitarium within easy reach
of the attending physicians, and within easy access of mar-
kets where proper food could be obtained, the court found
also:

"That the disease of pulmonary tuberculosis is very preva-
lent, and that one-seventh of the deaths in the United States
are caused by pulmonary tuberculosis; . . . that said
sanitarium conducted by the defendant is not a menace to
the plaintiffs, or either of them, or to any person living in
any building which may hereafter be erected upon the lots
owned by the plaintiffs; . . . that the germs of tuber-
culosis may be carried by house flies from the sputum of con-
sumptives; . . . that there exists a general public dread
of tuberculosis, and the maintenance of a tubercular hospital
in the vicinity of residences detracts from the comfortable use
of such residential property, on account of the dread of con-
tagion therefrom, in the minds of persons ignorant of the
true nature of the disease and the harmlessness of such sani-
taria; . . . that the plaintiffs' property will, by the main-
tenance of said sanitarium be less salable and lessened in
value from 33 1-3 per cent to 50 per cent and the other prop-

erty in said neighborhood will be lessened in value in decreasing ratio, depending upon the distance located from said sanitarium."

From these findings, and others which we have not deemed it necessary to notice, the court made the following conclusions of law:

"(1) That any and all damages, if any, which the plaintiffs have sustained in the past and will sustain in the future by reason of the maintenance and operation of said sanitarium conducted by the defendant, if continued to be conducted as it now is, are *damnum absque injuria.*

"(2) That the plaintiffs are not entitled to an injunction in this action enjoining or preventing the defendant from operating or maintaining the sanitarium owned and conducted by the defendant.

"(3) That said sanitarium is not a nuisance *per se* and is not a nuisance in the manner in which it is being conducted.

"(4) That the defendant is entitled to have this action dismissed and entitled to recover of and from the plaintiffs his costs and disbursements herein."

From these conclusions, and the decree thereupon rendered, plaintiffs have appealed.

The text of our decision has been aptly stated by counsel for appellant: "Can a tuberculosis hospital be maintained in a residential portion of a city, where its maintenance depreciates the value of contiguous property from thirty-three and one-half to fifty per cent, and where its existence detracts from the comfortable use of such residential property?" In the evolution of the law of nuisance, there has grown an element not clearly recognized at common law. Blackstone, 3 Com. 216, has defined a nuisance to be "anything that worketh hurt, inconvenience, or damage"; reducing the nuisances which affect a man's dwelling to three, (1) overhanging it; (2) stopping ancient lights, and (3) corrupting the air with smells. It will be seen that, within these definitions, the maintenance of a sanitarium conducted with due attention to sanitation is not a nuisance, for it creates no physical in-

convenience whatever. But a new element in the law of nuisance has been developed, first by judicial decisions, and later, by declaratory statutes—that is, the comfortable enjoyment of one's property. It is written in the statutes of this state:

"Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency . . . or in any way renders other persons insecure in life, or in the use of property." Rem. & Bal. Code, § 8309.

Respondent contends, and the court has found, that the property of respondent is not a nuisance *per se*, and that it is so conducted that it is not, and cannot be, a nuisance by reason of its use; that there is no real danger; that the fear or dread of the disease is, in the light of scientific investigation, unfounded, imaginary, and fanciful; and that the injury, if any, is *damnum absque injuria*. On the other hand, the appellants insist that the location of a sanitarium for the treatment of a disease, of which there is a positive dread which science has so far failed to combat, so robs them of that pleasure in, and comfortable enjoyment of, their home as to make it an actionable nuisance under the statute; and furthermore, under the findings of the court, that the presence of the sanitarium in a district given over to residences, and which has depreciated property from thirty-three to fifty per cent, is such a deprivation of property as will warrant a decree in their favor under the maxim *sic utere tuo ut alienum non laedas*.

Waiving for the present the substantial pecuniary damage which the court found to exist, and addressing ourselves to the principle underlying the lower court's decree—that is, that the danger being only in the apprehension of it, a fear unfounded and unsustained by science, a demon of the imagination—the courts will take no account of it; if dread of the disease and fear induced by the proximity of the sanitarium, in fact, disturb the comfortable enjoyment of the

property of the appellants, we question our right to say that the fear is unfounded or unreasonable, when it is shared by the whole public to such an extent that property values are diminished. The question is, not whether the fear is founded in science, but whether it exists; not whether it is imaginary, but whether it is real, in that it affects the movements and conduct of men. Such fears are actual, and must be recognized by the courts as other emotions of the human mind. That fear is real in the sense indicated, and is the most essentially human of all emotions, there can be no doubt. M. Fernande Mazade has addressed his inquiries to this subject, and has but recently given his views, as well as the opinions of others, in the Paris *Revue*. Current Literature, Vol. 49, No. 3, p. 290 (Sept. 1910). The opinions collected are worth noticing. Alfred Capus, the psychological playwright, says: "Fear consists in capitulating to the instinct of self-preservation." M. Frederick Passy, of the Institute, "The bravest of men have known what fear is." M. Sicard, a professor of the Faculty of Medicine, considers fear or courage to be the result of temperament, training, and thought, and which can be partially eradicated by reasoning and education, but never to be overcome in its most acute form, namely, the instinct of self-preservation. The conclusion of the editor is that, "it is far from being unanimously admitted that fear is a ridiculous malady, or one of which one need be ashamed in ordinary circumstances."

Comfortable enjoyment means mental quiet as well as physical comfort. In *Deaconess Home & Hospital v. Bontjes*, 207 Ill. 553, 69 N. E. 748, 64 L. R. A. 215, under conditions which "greatly disturb the comfort and nerves and sleep of the inmates of complainants' home, and she and her family were greatly annoyed and distressed in mind," an injunction was sustained against the hospital as destructive to the peace, quiet, and comfort of the complainant. What "comfortable enjoyment" may be, must be determined by reference to the substantive word "comfort." This word has

not been specifically defined in connection with nuisance cases. In *Ross v. Butler*, 19 N. J. Eq. 294, 97 Am. Dec. 654, Chancellor Zabriskie says: "No precise definition can be given; each case has to be judged by itself;" but in *Forman v. Whitney*, 2 Keyes (N. Y.) 165, Webster's definition is adopted: "It implies some degree of positive animation of the spirits, or some pleasurable sensations derived from happy and agreeable prospects;" the court adding: "The word embraces whatever is requisite to give security from want, and furnish reasonable physical, mental and spiritual enjoyment."

Nuisance is a question of degree, depending upon varying circumstances. There must be more than a tendency to injury; there must be something appreciable. The cases generally say tangible, actual, measurable, or subsisting. But in all cases, in determining whether the injury charged comes within these general terms, resort should be had to sound common sense. Each case must be judged by itself. Joyce, Nuisances, 19. Regard should be had for the notions of comfort and conveniences entertained by persons generally of ordinary tastes and susceptibilities. *Columbus Gas Light & Coke Co. v. Freeland*, 12 Ohio St. 392; *Barnes v. Hathorn*, 54 Me. 124. The nuisance and discomfort must affect the ordinary comfort of human existence as understood by the American people in their present state of enlightenment. Joyce, Nuisances, § 20. The theories and dogmas of scientific men, though provable by scientific reference, cannot be held to be controlling unless shared by the people generally. In *Grover v. Zook*, 44 Wash. 494, 87 Pac. 638, this court said:

"That pulmonary tuberculosis is both contagious and hereditary, as these terms are understood (although not in a strictly technical and professional sense), as well as infectious, admits of little, if any, doubt."

This principle applies with peculiar force in this case, for aside from the general dread of the disease, as found by the court, it is also shown that the security of the public depends upon proper precautions and sanitation, which may at any

time be relaxed by incautious nurses or careless or ignorant patients.

Furthermore, the court found that the bacilla of the disease may be carried by house flies. Thus, every house fly that drones a summer afternoon in the drawing room or nursery is a constant reminder to plaintiffs of their neighbor, tending to disquiet the mind and render the enjoyment of their home uncomfortable.

The only case we find holding that fear alone will not support a decree in this class of cases is *Anonymous,* 3 Atk. 750, where Lord Hardwicke said: "And the fears of mankind, though they may be reasonable ones, will not create a nuisance." Our statute modifies, if indeed it was not designed to change this rule. Under the facts, we cannot say that the dread which is the disquieting element upon which plaintiffs' complaint is made to rest, is unreal, imaginary, or fanciful. In so doing, we are not violating the settled principles of the law, but affirming them. We conceive the case of *Stotler v. Rochelle* (Kan.), 109 Pac. 788, to be directly in point. There we find the same contentions made as here. The question was, whether the fear of cancer was sustained in the light of medical authority. The court said:

"In the present state of accurate knowledge on the subject, it is quite within bounds to say that, whether or not there is actual danger of the transmission of the disease under the conditions stated, the fear of it is not entirely unreasonable."

The unusual feature of that case, in that judicial notice is taken of the fact that fear may be urged as a ground for injunctive relief, challenged the interest of the Hon. John D. Lawson, the learned editor of the American Law Review. He takes no issue with the rule. He says:

"A hospital, said the court, is not a nuisance *per se*, or even *prima facie*, but it may be so located and conducted as to be a nuisance to people living close to it. The question was not whether the establishment of the hospital would place the occupants of the adjacent dwellings in actual danger of

infection, but whether they would have reasonable ground to fear such a result, and whether, in view of the general dread inspired by the disease, the reasonable enjoyment of their property would not be materially interfered with by the bringing together of a considerable number of cancer patients in this place. However carefully the hospital might be conducted, and however worthy the institution might be, its mere presence, which would necessarily be manifested in various ways, would make the neighborhood less desirable for residence purposes, not to the oversensitive alone, but to persons of normal sensibilities. The court concluded that upon these considerations the injunction was rightfully granted. The plaintiff, as the owner and occupant of adjacent property, had such a peculiar interest in the relief sought as to enable him to maintain the action." Vol. 44, American Law Review, No. 5, p. 759.

In the case of *Baltimore v. Fairfield Imp. Co.*, 87 Md. 352, 39 Atl. 1081, 67 Am. St. 344, 40 L. R. A. 494, an injunction against placing a leper in a residence neighborhood for care and restraint was justified upon the ground that the disease produced a terror and dread in the minds of the ordinary individual. In that case, the court said:

"Leprosy is and has always been, universally regarded with horror and loathing. . . . The horror of its contagion is as deep-seated today as it was more than two thousand years ago in Palestine. There are modern theories and opinions of medical experts that the contagion is remote and by no means dangerous; but the popular belief of its perils founded on the Biblical narrative, on the stringent provisions of the Mosaic law that show how dreadful were its ravages and how great the terror which it excited, and an almost universal sentiment, the result of a common concurrence of thought for centuries, cannot in this day be shaken or dispelled by mere scientific asseveration or conjecture. It is not, in this case, so much a mere academic inquiry as to whether the disease is in fact highly or remotely contagious; but the question is whether, viewed as it is by the people generally, its introduction into a neighborhood is calculated to do a serious injury to the property of the plaintiff there located."

In *Cherry v. Williams*, 147 N. C. 452, 61 S. E. 267, 125

Am. St. 566, a temporary restraining order was granted against the maintenance of a tuberculosis hospital, notwithstanding evidence was introduced, as in this case, tending to show that the establishment of such a hospital, if properly maintained and conducted, would not be a menace to the health of the community, but in fact a benefit. We have no cases in this state directly in point, yet a case not without bearing is that of *Shepard v. Seattle*, 59 Wash. 363, 109 Pac. 1067. Judge Rudkin, delivering the opinion of the court, said:

"The presence of a private insane asylum, with its barred windows, and irresponsible inmates, would annoy, injure, and endanger the comfort, safety, and repose of any person of average sensibilities, if located within two hundred feet of his place of abode. In other words, it is a matter of common knowledge that the presence of such an institution in a residential portion of a city would practically destroy the value of all property within its immediate vicinity for residence purposes."

We therefore conclude that the lower court erred in denying an injunction. The case is remanded with instructions to enter a decree upon the findings in favor of appellant.

RUDKIN, C. J., CROW, DUNBAR, and MORRIS, JJ., concur.