[No. 15319.   Department Two.   October 10, 1919.]

CHARLES F. GOODRICH, *et al., Respondents,* v. GEORGE
E. STARRETT *et al., Appellants.*[1]

NUISANCE (2) — WHAT CONSTITUTES PRIVATE NUISANCE — UNDER-
TAKING ESTABLISHMENT—INJUNCTION.   Under Rem. Code, §§ 943, 8309,
defining nuisance, and adding to the common law definition a new
element—"the comfortable enjoyment of one's property"—an under-
taking establishment and morgue, conducted in an old dwelling out
of repair in the residential section of the city in such a manner as
to affect the peace of mind and destroy the property values of the
neighborhood will be enjoined as a nuisance.

Appeal from a judgment of the superior court for
Jefferson county, Ralston, J., entered September 29,
1917, upon findings in favor of the plaintiffs, in an
action for an injunction, tried to the court.   Affirmed.

*A. R. Coleman,* for appellants.

*Allan Trumbull,* for respondents.

FULLERTON, J.—This is an action to enjoin the
maintenance of an undertaking establishment and
morgue, alleged in the complaint to constitute a
nuisance.   The trial court entered a permanent in-
junction, and defendants appeal.

The facts appearing in the record are in substance
these:  The appellant Starrett is the owner of a build-
ing originally constructed as a dwelling-house, situ-
ated in a residence portion of the city of Port Town-
send, which is surrounded by the dwelling-houses of
others in use as residences by their owners.  For some
twenty years prior to the commencement of the action,
Starrett, either by himself or in partnership with
others, had conducted an undertaking establishment
and morgue in the city of Port Townsend, at a place

[1]Reported in 184 Pac. 220.

remote from residences, and to which there was seemingly no objection because of its location. Some three years prior to the commencement of the action, Starrett entered into partnership with his coappellant, Weeks, for the conduct of the business, and shortly prior to the commencement of the action, moved the business to the dwelling house of Starrett before mentioned. At the time of the removal, the house was somewhat out of repair, one of the windows was entirely gone and others had in them broken panes of glass, all were without fly screens, or screen of any sort save for some sash curtains of a flimsy nature, and there were no proper sewer connections necessary, as one of the appellants admitted, to the conduct of a first-class morgue. With the house in this condition, the appellants began to receive dead bodies for the purpose of preparing them for burial, those dying from contagious and infectious diseases as well as others. Their testimony was, however, to the effect that the building was being put in repair as rapidly as possible.

The respondents severally own dwelling-houses which are adjacent to and surround the house in which the appellants are conducting their business. The testimony of the respondents was to the effect that the conduct of the business greatly interfered with the enjoyment of their homes; that they lived in dread of acquiring some contagious disease; that the constant conveying of dead bodies in and out of the building, the conducting of funeral services therein, accompanied, as they are, by the hysterical sobbing of the relatives of the dead, has a depressing effect upon them, especially the womenfolk of the families, who, because of the nature of their duties, must remain in the homes and be constant witnesses of the business conducted by the appellants. As typical of the testimony concerning the effect the conduct of the business

had upon the surrounding families, we quote from the testimony of the respondent Mrs. Goodrich:

"I am unable to relish my meals or sleep properly; it is on my mind continually. It has a depressing effect upon me. I don't think I am over sensitive. I have been with the dead at the time of dying, and have no fear of spirits or anything like that, but it is very disagreeable. I have a constant fear of contagion from living in close proximity to a morgue, on account of my children and family. I have noticed a great many flies around my premises lately. I am continually fighting them in the house; we are in fear of them all the time. It suggests this morgue the moment I see a fly. I can see in the morgue. I can see from my back door the entrance there, I presume, to the basement of the cellar of the house, and upstairs I can see what goes on in the street, I can hear hysterical sobbing and the music that is played there. From my yard I can see them carrying in and out dead bodies. It spoils the enjoyment of our home. I don't care to invite guests to dine at my table; I know that a great many of my friends have the same feeling that I have in regard to it. My chief pleasure has been in caring for my garden, and I am denied that pleasure. If the morgue continues to run in close proximity to my residence, I feel that I cannot live there, and will want to move as soon as we are able."

There was testimony also that the permanent operation of the business will greatly decrease the money value of the surrounding property, and testimony of a physician, called as an expert, to the effect that contagious diseases could be carried from the dead bodies in the morgue to the inhabitants of the surrounding dwellings, although it can be gathered from his evidence that he thought the probability somewhat remote.

The testimony of the respondents as to the danger to them arising from the presence of the undertaking establishment was denied by the appellants, and their

testimony tended also to minimize the injury testified by the respondents to arise from the general conduct of the business.

It is the appellants' contention that the facts do not justify the judgment of the court. Attention is called to the general rule that the business of an undertaker is not a nuisance *per se*, and to the corollary of the rule that before it can be held to be such, some special circumstances must be shown taking the particular business from without the rule, and argue that the evidence here fails to disclose any such special circumstance.

The code, under the chapter entitled "Nuisances," defines a nuisance as follows:

"Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal, or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property." Rem. Code, § 8309.

In the chapter of the code prescribing a remedy for the abatement of nuisances, a nuisance is further defined as:

" . . . whatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of life and property, . . ." Rem. Code, § 943.

In *Everett v. Paschall,* 61 Wash. 47, 111 Pac. 879, Ann. Cas. 1912B 1128, 31 L. R. A. (N. S.) 827, we said that these statutes somewhat widened the common law definition of nuisance, in that a new element was added, "that is, the comfortable enjoyment of one's

property"; and it was there held that dread of disease and fear produced thereby, contrary to the holding of a case founded upon the common law, warranted injunctive relief against a sanitarium for the care of patients afflicted with tuberculosis, which it was sought to establish in a residence district of the city. And this notwithstanding the expert testimony which tended to show that the danger of contagion to the surrounding residents was remote and the fear more imaginary than real.

In *Densmore v. Evergreen Camp No. 147, W. O. W.,* 61 Wash. 230, 112 Pac. 255, Ann. Cas. 1912B 1206, 31 L. R. A. (N. S.) 608, the principle was applied to an undertaking establishment. It was there held that such an establishment could be enjoined as a nuisance when it was sought to conduct it in a residence district, notwithstanding it was maintained with every sanitary precaution.

The principle of these cases clearly justifies the judgment of the trial court. The witness from which we have quoted but voiced the feeling and sentiment of the ordinary individual who is compelled to live near an institution of this sort. The injury to her is physical and actual; it does not depend upon imagination. There are persons, of course, whose occupations have brought them to endure conditions of this sort without suffering or discomfort. But this is the result of their environment. The ordinary individual cannot endure them without actual discomfort and physical suffering, until, at least, his senses have become hardened by a long period of exposure to them. In addition to this, there is the positive showing of destruction of property values. While counsel question the sufficiency of the evidence in this respect, we think the only thing indefinite about it is the amount of the decrease. That there is a substantial decrease, we think

was abundantly proven. Indeed, it would seem that it is within the ordinary knowledge of mankind that the erection of an undertaking establishment and morgue in a district of a city suitable only for and used only for residence purposes would decrease the value of the surrounding property. Certainly no one possessing the sensibilities of the ordinary being would take up a residence in its vicinity as long as other places were obtainable.

But perhaps the appellants' principal reliance for reversal is the case of *Rea v. Tacoma Mausoleum Association*, 103 Wash. 429, 174 Pac. 961. In that case we held that an addition to a mausoleum would not be restrained as a nuisance, injuriously affecting adjoining residence property, when unattended by injurious or offensive drainage or fumes sensible to the complaining party. In the case, however, the cases of *Everett v. Paschall* and *Densmore v. Evergreen Camp No. 147, W. O. W.*, were noticed and held not to be in conflict with the principle there announced. We are still of the same opinion, and hold that the case in no way reflects upon the earlier cases as authority.

We think it needless to pursue the inquiry further. Our conclusion is that the judgment appealed from should stand affirmed. It is so ordered.

Holcomb, C. J., Mount, and Bridges, JJ., concur.